**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TONEY A. HARRISON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:12CV 140 JAR(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Toney A. Harrison for Disability Insurance Benefits under Title II of

the Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause

was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the

Complaint. (Document Number 20). Defendant has filed a Brief in Support of the Answer.

(Doc. No. 25).

## Procedural History

On April 13, 2010, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on December 13, 2009. (Tr. 107-08, 114-17). This

claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated May 23, 2011. (Tr. 61-62, 15-21).

- 1 -

Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council, which was denied on November 22, 2011. (Tr. 6, 1-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on May 4, 2011. (Tr. 27). Plaintiff was present and was represented by counsel. (Id.). Also present was vocational expert James Israel. (Id.).

The ALJ examined plaintiff, who testified that he was thirty-four years of age. (Tr. 29). Plaintiff stated that he left school in the eighth grade due to being bullied, and obtained his GED in 1995. (Tr. 29-30).

Plaintiff testified that he was single and had no children. (Tr. 30). Plaintiff stated that he lived with his parents, and that he had never lived on his own. (Id.).

Plaintiff testified that his father was disabled, and that he was hospitalized at the time of the hearing. (Tr. 31). Plaintiff stated that he is unable to help his father due to his own condition. (Id.). Plaintiff testified that half the time, his father helps him. (Id.). Plaintiff stated that he occasionally needs his father to help him stand, get in and out of the shower, walk into the house, and walk up a flight of stairs. (Id.).

Plaintiff testified that he has always worked as an unarmed security guard in charge of patrolling premises. (Tr. 32). Plaintiff stated that his jobs have required him to stand and walk six hours out of eight. (Id.). Plaintiff testified that, at his last position, he was also required to sit and monitor cameras for periods of thirty to forty minutes, although he stood and walked more than two hours in an eight-hour workday. (Id.). Plaintiff stated that he last worked in December of

2009.  (Tr. 34).

Plaintiff testified that he was hospitalized in December 2009 due to symptoms of blurred vision, heart fluttering, lightheadedness, and high blood pressure.  (Id.).  Plaintiff stated that his status was classified as "grave" when he was admitted.  (Id.).  Plaintiff testified that he had not been hospitalized since that time.  (Id.).

Plaintiff stated that, since December 2009, he had been experiencing symptoms of shortness of breath when walking too long and walking up stairs, locking of his legs and arms, and inflammation of his muscles and joints.  (Tr. 35).  Plaintiff testified that he did not have insurance.  (Id.).  Plaintiff stated that his doctor, Dr. Brian Bergfeld, referred him to a rheumatologist, but he had not seen a rheumatologist because his father had been hospitalized.  (Tr. 36).   Plaintiff testified that he last saw Dr. Bergfeld in April of 2011.  (Id.).

Plaintiff stated that he was unable to walk one block due to shortness of breath.  (Id.).  Plaintiff testified that he had to stop to rest once for three to five minutes when walking to the hearing from the parking garage across the street.  (Id.).  Plaintiff stated that he has to stop to rest when climbing one flight of stairs.  (Tr. 37).

Plaintiff testified that he experiences joint pain and numbness in his arms from his elbow down to his fingers.  (Id.).  Plaintiff stated that he had also been experiencing pain from his ankles up to his groin for three to four months, which increased in April.  (Id.).  Plaintiff testified that he reported these problems to Dr. Bergfeld when he saw him in April.  (Tr. 38).  Plaintiff stated that Dr. Bergfeld prescribed antibiotics and referred him to a rheumatologist.  (Id.).

Plaintiff testified that, in December 2009, he was unable to lift a gallon of milk.  (Tr. 39).  Plaintiff stated that he was unable to walk one block.  (Id.).  Plaintiff testified that he was able to

stand five to fifteen minutes before he would become exhausted. (Id.). Plaintiff stated that he had no difficulty sitting. (Id.).

Plaintiff's attorney examined plaintiff, who testified that he had difficulty holding objects because he was unable to feel his hands. (Tr. 40). Plaintiff stated that this has been occurring for three to four months. (Id.).

Plaintiff testified that he experienced chest pain almost daily, until he took his medication. (Id.). Plaintiff stated that the chest pain can last hours. (Id.). Plaintiff testified that the medication causes him to experience drowsiness. (Id.).

Plaintiff stated that he still experiences dizziness and lightheadedness. (Tr. 41). Plaintiff testified that these symptoms sometimes occur when he stands up too fast, and sometimes have no trigger. (Id.). Plaintiff stated that he occasionally feels his heart fluttering and his vision blurs when he is sitting down watching televison. (Id.).

Plaintiff testified that he had been diagnosed with sleep apnea[1] and that he used a continuous positive airway pressure ("CPAP") machine. (Id.). Plaintiff stated that he was able to get restful sleep at night with the CPAP machine. (Id.). Plaintiff testified that he occasionally napped during the day, and that he sometimes fell asleep after taking his medication. (Tr. 42).

Plaintiff stated that he was working as a security guard in December of 2009. (Id.). Plaintiff testified that he did not return to work because he continued to experience symptoms and did not believe he could adequately perform his job. (Id.).

---

[1] A disorder characterized by recurrent interruptions of breathing during sleep, due to temporary obstruction of the airway by lax, excessively bulky, or malformed pharyngeal tissues, with resultant hypoxemia and chronic lethargy. See Stedman's Medical Dictionary, 119 (28th Ed. 2006).

Plaintiff stated that he did not have a driver's license, and that he had never obtained a driver's license. (Id.). Plaintiff testified that either his parents took him to work, or he took a cab or bus. (Tr. 43).

Plaintiff stated that, during a typical day, he watches television. (Id.). Plaintiff testified that he does not do any household chores. (Id.). Plaintiff stated that he does not participate in any community activities. (Id.). Plaintiff testified that he only socializes with his sister, otherwise he is homebound. (Id.).

Plaintiff stated that he had never been treated for depression or any other psychological issues. (Tr. 44).

The ALJ then examined the vocational expert, Mr. Israel, who testified that plaintiff's past work was classified as security guard and was semi-skilled and light. (Tr. 46). The ALJ asked Mr. Israel to assume a hypothetical claimant with plaintiff's background and the following limitations: able to lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk a total of two hours in eight; sit a total of six hours in eight; occasionally balance, kneel, crouch, crawl, stoop, climb ramps and stairs; no climbing ladders, ropes or scaffolds; no prolonged exposure to extreme heat or cold; and no dangerous unprotected heights or dangerous unprotected moving machinery. (Tr. 47). Mr. Israel testified that the individual would be unable to perform plaintiff's past work. (Id.). Mr. Israel stated that the individual could perform many other jobs, such as surveillance monitor (500 jobs in Missouri); order clerk (4,500 in Missouri); and data entry clerk (1,500 in Missouri). (Tr. 47-48). Mr. Israel testified that these positions would include two fifteen-minute breaks and a thirty minute or one hour lunch break. (Tr. 50). Mr. Israel stated that the amount of time an employee would be permitted to be off-task would

vary greatly, although employers generally want employees on task most of the time.  (Id.).  Mr. Israel testified that most employers tolerate one to two absences a month.  (Tr. 51).

The ALJ next asked Mr. Israel to add the limitation of occasional handling and fingering with the dominant right arm.  (Tr. 48).  Mr. Israel testified that there were no jobs such an individual could perform.  (Tr. 49).

Plaintiff's attorney then asked Mr. Israel to assume the claimant was limited to one or two-step instruction tasks due to concentration issues.  (Tr. 51).  Mr. Israel testified that this limitation would preclude the jobs he mentioned, although the claimant would be able to perform other jobs, such as sedentary assembly jobs.  (Tr. 52).  Mr. Israel stated that the claimant would be unable to perform any sedentary jobs if the use of his hands were limited, as discussed with regard to the ALJ's second hypothetical.  (Id.).

Plaintiff's attorney requested a psychological evaluation due to plaintiff's psychological complaints and lack of psychological treatment.  (Tr. 53).  The ALJ indicated that he would take plaintiff's request under advisement.  (Id.).

**B.**    **Relevant Medical Records**

The record reveals that plaintiff presented to St. Mary's Health Center on March 23, 2007, with complaints of a three-to-four-week history of cough, fever, chills, breathlessness, and chest discomfort.  (Tr. 275).  Plaintiff weighed 313 pounds.  (Id.).  An echocardiogram revealed significant left ventricular dysfunction with an ejection fraction[2] of twenty-five percent.  (Id.).  An

---

[2]The fraction of the blood contained in the ventricle at the end of diastole that is expelled during its contraction, normally 55 percent or greater; with the onset of congestive heart failure, the ejection fraction decreases.  Stedman's at 769.

electrocardiogram revealed probable left ventricular hypertrophy, and left atrial enlargement. (Tr. 276). Plaintiff was diagnosed with dilated cardiomyopathy,[3] etiology unclear. (Id.).

Plaintiff saw Jorge Hernandez, M.D. for follow-up on April 4, 2007, at which time plaintiff reported that his shortness of breath had improved, although he still experienced dyspnea on exertion with moderate degrees of physical activity. (Tr. 264). It was noted that plaintiff had been admitted due to progressive shortness of breath and pitting edema[4] and had been diagnosed with congestive heart failure[5] and severe dilated cardiomyopathy with an ejection fraction of twenty-five percent. (Id.). Plaintiff had been treated with aspirin, Furosemide,[6] Lisinopril,[7] and Atenolol.[8] (Id.). Dr. Hernandez noted no abnormalities on examination. (Id.). Dr. Hernandez continued plaintiff's medications, and recommended that plaintiff undergo further testing to rule out coronary artery disease. (Id.).

Plaintiff saw Dr. Hernandez on May 8, 2007, at which time plaintiff remained asymptomatic and denied any palpitations, shortness of breath, or chest pain. (Tr. 261). Dr. Hernandez indicated

---

[3]Decreased function of the left ventricle associated with its dilation; usually manifested by signs of overall cardiac failure, with congestive findings, as well as by fatigue indicative of a low output state. Stedman's at 313.

[4]Edema in which pressure leaves a persistent indentation. Stedman's at 613.

[5]Inadequacy of the heart so that as a pump it fails to maintain the circulation of blood, with the result that congestion and edema develop in the tissues. Resulting clinical syndromes include shortness of breath, pitting or nonpitting edema, enlarged tender liver, engorged neck veins, and pulmonary rales in various combinations. Stedman's at 699.

[6]Furosemide is indicated for the treatment of edema associated with congestive heart failure. See Physician's Desk Reference ("PDR"), 2186 (63rd Ed. 2009).

[7]Lisinopril is indicated for the treatment of hypertension. See PDR at 2088.

[8]Atenolol is indicated for the treatment of hypertension. See PDR at 2177.

that plaintiff had undergone cardiac catheterization, which confirmed nonischemic dilated cardiomyopathy. (Id.). Plaintiff was taking aspirin, Lisinopril, Furosemide, and Toprol.[9] (Id.). Plaintiff's blood pressure was 130/80, and his physical examination was normal. (Id.). Dr. Hernandez increased plaintiff's Lisinopril. (Id.). On July 17, 2007, Dr. Hernandez noted that plaintiff had remained asymptomatic from a cardiovascular point of view. (Tr. 258). Plaintiff reported that he becomes very fatigued, especially when doing his rounds as a security guard. (Id.). Plaintiff's physical examination revealed no abnormalities. (Id.). Dr. Hernandez adjusted plaintiff's medications. (Id.). On March 11, 2008, Dr. Hernandez indicated that plaintiff had remained asymptomatic, and complained only of easy fatiguability. (Tr. 257).

Plaintiff underwent echocardiograms on April 24, 2008, which were normal. (Tr. 252). Plaintiff's ejection fraction was sixty percent. (Id.).

Plaintiff presented to Dr. Hernandez on September 2, 2008, for follow-up, at which time plaintiff reported that he had stopped taking his medications three weeks prior because he ran out of the prescriptions. (Tr. 251). Plaintiff's blood pressure was elevated, and his physical examination revealed no abnormalities. (Id.). Dr. Hernandez prescribed medications and advised plaintiff about the importance of taking his medications. (Id.).

Plaintiff presented to DePaul Health Center on December 9, 2009, with complaints of chest pains and palpitations, which started the previous day when he was sitting down watching television. (Tr. 313). Dr. Das indicated that plaintiff's EKG did not reveal any acute changes. (Id.). Plaintiff underwent an echocardiogram, which revealed an ejection fraction of thirty to thirty-five percent. (Tr. 315). Dr. Das diagnosed plaintiff with atypical chest pain, history of nonischemic

---

[9]Toprol is indicated for the treatment of hypertension and heart failure. See PDR at 668.

cardiomyopathy with ejection fraction estimated at thirty to thirty-five percent, hypertension, sleep apnea, and palpitations. (Id.). Dr. Das prescribed Lisinopril, Carvedilol,[10] and Aldactone,[11] and discharged plaintiff on December 10, 2009. (Tr. 316). He indicated that plaintiff was permitted to do a "moderate amount of activity," with strenuous activities prohibited. (Id.).

Plaintiff presented to DePaul Health Center on December 11, 2009, with complaints of chest pains. (Tr. 303). Dr. Das diagnosed plaintiff with atypical chest pains, with low suspicion for coronary artery disease; history of palpitations; history of nonischemic cardiomyopathy with ejection fraction of thirty-five percent; hypertension; and sleep apnea. (Tr. 304). Plaintiff was discharged in stable condition on December 15, 2009, with diagnoses of chest pain and nonischemic cardiomyopathy. (Tr. 307). Dr. Das prescribed Isordil[12] and Apresoline,[13] and Nexium,[14] and indicated that plaintiff could not exercise or engage in strenuous activity, although moderate exertion was permitted. (Id.).

On January 13, 2010, plaintiff presented to Sundeep Das, M.D. for a general cardiology follow-up. (Tr. 220). Plaintiff complained of worsening shortness of breath, dizziness, and near-syncope. (Id.). Plaintiff had undergone nuclear stress testing on January 5, 2010, which revealed a

---

[10]Carvedilol is indicated for the treatment of hypertension and heart failure. See PDR at 1396.

[11]Aldactone is indicated for the treatment of hypertension. See WebMD, http://www.webmd.com/drugs (last visited November 28, 2012).

[12]Isordil is indicated for the treatment of chest pain. See WebMD, http://www.webmd.com/drugs (last visited November 28, 2012).

[13]Apresoline is indicated for the treatment of hypertension. See WebMD, http://www.webmd.com/drugs (last visited November 28, 2012).

[14]Nexium is indicated for the treatment of GERD. See WebMD, http://www.webmd.com/drugs (last visited November 28, 2012).

dilated left ventricle with a calculated ejection fraction of fifty-four percent. (Tr. 219). Dr. Das diagnosed plaintiff with cardiomyopathy, class 2-3,[15] getting worse; sleep apnea; congestive heart failure; and obesity. (Tr. 222). Dr. Das prescribed medication and recommended additional testing. (Id.).

Plaintiff underwent a sleep study, upon the referral of Dr. Das, on February 2, 2010. (Tr. 232). The sleep study revealed moderate sleep apnea. (Id.). It was recommended that plaintiff try a CPAP machine. (Tr. 233). Plaintiff was cautioned about driving and operating dangerous machinery. (Id.).

On February 10, 2010, plaintiff complained of shortness of breath, which had improved. (Tr. 215). Plaintiff denied chest pain and palpitations. (Id.). Dr. Das diagnosed plaintiff with cardiomyopathy, which was better; sleep apnea; and essential hypertension. (Tr. 217). He adjusted plaintiff's medications. (Id.).

Plaintiff presented to Dr. Das for follow-up on April 5, 2010, at which time plaintiff complained of chest pain and shortness of breath occurring two times a day, usually when he was walking in the park or doing any exertion, and lasting three to five minutes. (Tr. 211). Plaintiff also reported leg pain with exertion, and palpitations one to two times a day, with associated blurred

---

[15]Doctors usually classify patients' heart failure according to the severity of their symptoms. The most commonly used classification system, the New York Heart Association Functional Classification, places patients in one of four categories based on how much they are limited during physical activity. Class II denotes, "[p]atients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea or anginal pain." Class III indicates, "[p]atients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain." American Heart Association, Classes of Heart Failure, http://www.heart.org/HEARTORG/Conditions/Classes-of-Heart-Failure_UCM_306328_Article.jsp (last visited November 28, 2012).

vision that lasts two to three deep breaths. (Id.). Dr. Das diagnosed plaintiff with cardiomyopathy, sleep apnea, palpitations, and chest pain-type to be determined. (Tr. 213). Dr. Das added Imdur[16] and Ranexa[17] to plaintiff's prescription regimen. (Id.).

In a letter addressed "To whom it may concern" dated May 4, 2010, Dr. Das stated that, "even on maximal medical management, [plaintiff] has a history of severe nonischemic cardiomyopathy and is still experiencing symptoms defined within the American Heart Association Class 2-3." (Tr. 155).

Plaintiff presented to Dr. Das for follow-up on May 12, 2010, at which time plaintiff's symptoms were unchanged. (Tr. 207). Plaintiff complained of chest pains occurring two times a day lasting three to five minutes and associated shortness of breath, and palpitations one to two times day with blurred vision. (Tr. 207). Plaintiff had undergone a EKG on April 5, 2010, which was within normal limits, revealing an ejection fraction of sixty percent. (Tr. 206, 226). Plaintiff reported that he went to Wal-Mart and could not walk there, became short of breath, and had to rest. (Id.). Plaintiff also indicated that he became pale and developed a headache. (Id.). Dr. Das diagnosed plaintiff with cardiomyopathy-no coronary heart failure on exam, has symptoms of low co state; sleep apnea; palpitations; and chest pain-type to be determined. (Tr. 208-09). Dr. Das prescribed Norvasc[18] and increased plaintiff's Ranexa for plaintiff's chest pain. (Id.).

_____

[16]Imdur is indicated for the treatment of chest pain associated with coronary artery disease. See WebMD, http://www.webmd.com/drugs (last visited November 28, 2012).

[17]Ranexa is indicated for the treatment of chest pain. See WebMD, http://www.webmd.com/drugs (last visited November 28, 2012).

[18]Norvasc is indicated for the treatment of hypertension. See WebMD, http://www.webmd.com/drugs (last visited November 28, 2012).

Plaintiff presented to Dr. Das for follow-up on July 21, 2010, at which time plaintiff's symptoms were entirely unchanged. (Tr. 322). Plaintiff complained of shortness of breath and chest pain with any activity in the heat, which lasts until he gets back into the cool inside. (Id.). Plaintiff also reported chest pain without exertion, which was not as severe, along with associated shortness of breath. (Id.). Plaintiff indicated that he was experiencing palpitations one to two times a day, along with blurred vision. (Id.). Dr. Das diagnosed plaintiff with cardiomyopathy-resolved, ejection fraction normal limits now; essential hypertension; chest pain-type to be determined; and obesity. (Tr. 324). It was noted that plaintiff had gained thirty-seven pounds in the past three to four months. (Id.). Dr. Das prescribed an inhaler for the shortness of breath and chest pain precipitated by hot air, and advised plaintiff to lose weight. (Tr. 325).

Plaintiff saw Melvin Butler, M.D. for an internal medicine examination on September 7, 2010. (Tr. 246-49). Plaintiff reported that he was unable to walk longer than one-fourth of a block without experiencing shortness of breath, chest pain, and fatigue. (Tr. 246). Upon examination, plaintiff had no difficulty ambulating around the office or in the hall, appeared to be sitting comfortably, and demonstrated no difficulty getting from the sitting position to the standing position, or getting on and off of the examination table. (Tr. 248). Plaintiff's cardiovascular examination was normal. (Id.). Plaintiff's upper and lower extremity examinations were also normal. (Id.). Dr. Butler diagnosed plaintiff with cardiomyopathy, congestive heart failure, sleep apnea, obesity, and GERD.[19] (Tr. 249). Dr. Butler stated that plaintiff had subjective complaints of shortness of breath, and intermittent chest

---

[19]Gastroesophageal reflux disease (GERD) is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. See Stedman's at 556.

pain and fatigue after walking approximately one-fourth of a block, which usually resolve with rest. (Id.). Dr. Butler also noted that plaintiff had a history of obesity. (Id.). Finally, Dr. Butler indicated that plaintiff had full bilateral grip strength. (Id.).

On April 13, 2011, plaintiff presented to Brian Bergfeld, M.D., with complaints of fatigue and body aches. (Tr. 327). Plaintiff reported a throbbing pain from his ankles into his groin and a twisting pain for two months, primarily in the thighs. (Id.). Plaintiff also complained of numbness in his right hand, with pins and needles, which went into his arm and shoulder, for two to three months. (Id.). Upon examination, Dr. Bergfeld noted tenderness in the thigh, back, and neck, and pain with range of motion of the right wrist and shoulder. (Tr. 328). Dr. Bergfeld diagnosed plaintiff with backache. (Id.). Dr. Bergfeld prescribed Naprosyn[20] and recommended additional testing. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since December 13, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments causing significant impairment in work function: a history of congestive heart failure/nonischemic dilated cardiomyopathy and obesity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

---

[20]Naprosyn is indicated for the treatment of rheumatoid arthritis. See PDR at 2632.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), meaning he can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, except he can only stand/walk 2 hours total in an 8-hour workday. He can sit 6 to 8 hours in an 8-hour workday. He can only occasionally balance, kneel, crouch, crawl, stoop, or climb ramps/stairs. He cannot climb ladders, ropes, or scaffolds. He cannot perform tasks involving prolonged exposure to extreme heat or cold and cannot work around dangerous and unprotected heights or dangerous and unprotected moving machinery.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on August 7, 1976 and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has high school equivalency certification and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 303.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 13, 2009, through the date of this decision. (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 17-21).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits filed on April 13, 2010, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on April 13, 2010, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 21).

## Discussion

**A.    Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.     Plaintiff's Claims

Plaintiff argues that the ALJ's findings regarding plaintiff's residual functional capacity are not supported by substantial evidence. Plaintiff also argues that, in determining plaintiff's RFC, the ALJ did not consider medical evidence from plaintiff's treating cardiologist.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863

(8th Cir. 2000)).  Similarly, in making a finding of residual functional capacity, an ALJ may

consider non-medical evidence, although the residual functional capacity finding must be

supported by *some* medical evidence.  See Lauer**,** 245 F.3d at 704.

> The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform light work as defined in
> 20 CFR 404.1567(b) and 416.967(b), meaning he can occasionally lift and carry
> 20 pounds and frequently lift and carry 10 pounds, except he can only stand/walk
> 2 hours total in an 8-hour workday.  He can sit 6 to 8 hours in an 8-hour workday.
> He can only occasionally balance, kneel, crouch, crawl, stoop, or climb
> ramps/stairs.  He cannot climb ladders, ropes, or scaffolds.  He cannot perform
> tasks involving prolonged exposure to extreme heat or cold and cannot work
> around dangerous and unprotected heights or dangerous and unprotected moving
> machinery.

(Tr. 18).

As support for his determination, the ALJ stated that the medical evidence does not

substantiate plaintiff's allegations of disability.  (Tr. 19).  The ALJ noted that no treating or

examining medical source has opined that plaintiff is permanently disabled or precluded "from

more than strenuous activity."  (Id.).  The ALJ stated that, even considering plaintiff's obesity and

history of cardiomyopathy could account for some limitation, there is no objective basis to

support dysfunction in excess of the RFC formulated by the ALJ.  (Id.).  The ALJ concluded that

his RFC assessment was supported by the record when considered as a whole.  (Id.).

Plaintiff contends that there was no medical evidence supporting an RFC for a reduced

range of light work.  Plaintiff argues that the ALJ did not cite any opinion evidence in support of

his determination.  Plaintiff further argues that the ALJ failed to consider the opinion of plaintiff's

treating cardiologist, Dr. Das, which was inconsistent with the ALJ's RFC determination.

In a letter dated May 4, 2010, Dr. Das stated that, "even on maximal medical

management, [plaintiff] has a history of severe nonischemic cardiomyopathy and is still experiencing symptoms defined within the American Heart Association Class 2-3." (Tr. 155). As plaintiff points out, the ALJ did not discuss this evidence in his decision.

It is not clear from the ALJ's opinion whether the ALJ actually considered the opinion of Dr. Das, or what weight the ALJ placed on this opinion. This represents incomplete analysis and requires remand. See Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) ("While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand.") (alteration in original) (citation omitted).

Under the regulations, treating physicians' opinions are entitled to controlling weight, provided that they are well-supported: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 416.927(d)(2). The regulations further state that, "[u]nless we give a treating source's opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion. (1) Examining relationship . . . . (2) Treatment relationship . . . . (3) Supportability . . . . (4) Consistency . . . . (5) Specialization . . . . (6) Other factors . . . . 20 C.F.R. 404.1527(d).

Dr. Das had been plaintiff's treating cardiologist since his hospitalization in December 2009, and saw plaintiff on a regular basis for treatment of his cardiac impairments. In January, 2010, plaintiff complained of worsening shortness of breath, dizziness, and near-syncope. (Tr.

220). Dr. Das diagnosed plaintiff with cardiomyopathy, class 2-3, getting worse; sleep apnea; congestive heart failure; and obesity; and prescribed medication. (Tr. 222). In February 2010, plaintiff complained of shortness of breath, which had improved. (Tr. 215). In April 2010, plaintiff reported chest pain and shortness of breath occurring two times a day, and lasting three to five minutes; leg pain with exertion; and palpitations once to two times a day, with associated blurred vision. (Tr. 211). In May and July 2010, Dr. Das indicated that plaintiff's symptoms were unchanged. (Tr. 207, 322). Dr. Das adjusted plaintiff's medications. (Id.). Dr. Das noted in May 2010 that plaintiff's April 2010 EKG was within normal limits, and in July 2010, Dr. Das changed his diagnosis to cardiomyopathy-resolved, ejection fraction normal limits. (Tr. 324). Dr. Das' opinion is consistent with his treatment notes, which reveal that plaintiff consistently complained of significant cardiac symptoms, even after testing in April 2010 revealed a normal ejection fraction. (Tr. 226).

As support for his RFC, the ALJ indicated that none of plaintiff's treating physicians found that plaintiff was precluded from more than "strenuous activity." (Tr. 19). Dr. Das, however, found that plaintiff was experiencing Class II to Class III symptoms. Class II symptoms indicate slight limitation of physical activity, with ordinary physical activity resulting in fatigue, palpitation, dyspnea or anginal pain; while class III symptoms indicate marked limitation of physical activity, with less than ordinary activity causing fatigue, palpitation, dyspnea, or anginal pain.[21]

The ALJ found that plaintiff was capable of performing a range of light work. "Light work" is defined in 20 C.F.R. § 404.1567(b) as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of up to ten pounds; and that might require a good deal

---

[21]See note 14, supra.

of walking or standing, sitting most of the time, and some pushing and pulling of arm or leg controls. The fact that plaintiff was experiencing class II to III symptoms casts doubt on his ability to perform light work, specifically the requirement of standing or walking for two hours out of an eight-hour workday.

In sum, the ALJ erred in failing to discuss the opinion of plaintiff's treating cardiologist, Dr. Das. Dr. Das' opinion is inconsistent with the performance of even a limited range of light work. No other physician expressed an opinion regarding plaintiff's ability to work with his impairments. Thus, the ALJ's RFC determination is not supported by substantial evidence.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to properly consider Dr. Das' opinion, formulate a new residual functional capacity for plaintiff based on the medical evidence in the record, and to adduce the testimony of a vocational expert to determine how plaintiff's non-exertional impairments restrict his ability to perform jobs in the national economy.

# **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this  14th  day of January, 2013.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE